COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Athey and Callins

KIMBERLY CULLIPHER

                                            MEMORANDUM OPINION[*] BY

v.      Record No. 1660-23-2           JUDGE DOMINIQUE A. CALLINS
                                              NOVEMBER 6, 2024

SPOTSYLVANIA COUNTY DEPARTMENT OF
 SOCIAL SERVICES


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

(James Joseph Ilijevich, on brief), for appellant. Appellant
submitting on brief.

(Robin N. Krueger; Patricia Joshi, Guardian ad litem for the minor
children; Edith M. Min, Guardian ad litem for appellant; The Law
Office of Robin N. Krueger, PLC; Patricia Joshi, PLLC; Edith M.
Min, PLLC, on brief), for appellee. Appellee and Guardians ad
litem submitting on brief.


Kimberly Cullipher ("mother") appeals the circuit court's orders terminating her parental

rights and approving the foster care goal of adoption for two of her children, E.C. and A.C.[1]

Mother argues that the court erred by terminating her parental rights under Code

§ 16.1-283(C)(2). She further contends that the court erred by finding that relative placement

was not in the best interests of the minor children despite the minor children's paternal

grandmother being willing to take custody of them. For the following reasons, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] We use initials for the children in order to attempt to protect their privacy.

BACKGROUND[2]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

## I. Mother's History of Interactions with the Department

In July 2020, child protective services in North Carolina initiated involvement with the family after the children's biological father, Michael Cullipher ("father"), was arrested for the alleged assault of mother. Soon thereafter, the family moved to Virginia. Over the next year, the family was involved in more than five subsequent social services investigations, including those initiated by the Spotsylvania County Department of Social Services (the "Department"). These investigations were initiated based on reports of domestic violence between mother and father, substance abuse in the home, known drug users visiting the family home, and "unlivable" home conditions, including roach infestations. Home visits confirmed allegations that the home "had trash, food with mold, . . . animal feces . . . [and] gnats throughout." Additionally, mother reported that her current partner was incarcerated due to a probation violation, that he was an active registrant on the sex offender registry, and that he was not allowed to be alone with the children. Despite the Department's efforts to provide mother with certain resources for her

---

[2] Parts of this record, as well as the appellant's brief, are sealed. It is necessary to unseal certain portions of the record and appellant's brief to resolve the issues raised. "Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion." *Brandon v. Coffey*, 77 Va. App. 628, 632 n.2 (2023). "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Id.* (quoting *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017)).

children, mother still did not have her children enrolled in school, and her children were not receiving mental health services.[3]

In September 2021, the Department received a report that mother's eldest minor child, E.C., had run away from home for the third time in a month. Child Protective Services ("CPS") and a deputy with the Spotsylvania Sheriff's Office presented to mother's home. When they arrived, mother told them that she "wanted [E.C.] to go to juvenile detention to 'teach her a lesson' because [E.C. thought] it [was] a joke." CPS and the deputy observed that E.C. and her younger sibling, A.C., were wearing the same clothes as when the Department visited the day before to implement a safety plan and that neither child appeared to have bathed in a "couple [of] days." Further, the deputy reported that mother stated that "she did not think she should clean the home when [E.C.] does not help." To this end, the deputy observed "clutter, trash, and old food," ants and fruit flies, and animal feces throughout the home, in addition to empty liquor bottles on the nightstand in the room where the family slept.

The Spotsylvania Sheriff's Office arrested mother for child neglect. There were no other caretakers present in the home and mother was unable to provide contact information for father or other relatives. Mother reported that E.C. and A.C. had not seen a pediatrician in almost two years and that although A.C. had asthma, mother had no medication for the child. Based on "concerns [of] poor living conditions, lack of supervision and care for the children, and lack of an identified caretaker to care for the children," the Department took custody of E.C. and A.C.

## II. J&DR Court Proceedings Relevant on Appeal

The Spotsylvania County Juvenile and Domestic Relations District Court (the "J&DR" court) ratified the emergency removal of E.C. and A.C. and determined that the minor children

---

[3] The Department "provided resources to [mother to] enroll the children in school and to obtain mental health services" and "helped [mother] with repairing her car to support her gaining employment."

were "abused or neglected" as defined in Code § 16.1-228. The Department subsequently filed a foster care plan for each child with the principal goal of returning them home. In pursuit of this goal, the Department set three primary conditions for mother and father: (1) maintaining an active role with the Department and treatment providers; (2) maintaining a sober lifestyle; and (3) obtaining and maintaining suitable and stable housing, and financial stability. Each objective featured a subset of conditions that mother and father were required to meet no later than September 2022.

The court-appointed special advocate ("CASA") for E.C. and A.C., however, expressed concerns that mother did "not have the capacity to care for her children" and that the minor children would otherwise be unsafe in mother's care since she sought to marry her "paramour," a convicted pedophile.[4] The CASA reportedly told mother "that the girls could not be placed in a home where he lives, but she d[id] not seem capable of grasping that reality or the danger [her paramour] pose[d] to her children." Thus, at the September 2022 permanency planning hearing, the J&DR court approved a new plan with the primary goal of relative placement, and an alternative goal of adoption. The J&DR court found that additional time was necessary to investigate the appropriateness of placing E.C. and A.C. with their paternal grandmother, Brenda Russell.

The Department prepared a new foster care plan, changing its goal to adoption, and formally filed its petition for permanency planning to that effect. In support of this petition, the Department filed a foster care service plan review for both E.C. and A.C., and a copy of the preliminary home study conducted for Russell. As part of the service plan review, the Department reported that mother was residing in a motel at which she worked; mother also

---

[4] Court records indicate that mother's paramour "sexually abused a four-year-old child" and was sentenced to 20 years of incarceration.

- 4 -

reportedly worked at a local grocery store, but her dual employment was "not sufficient to sustain her current living costs as well as . . . getting . . . more stable housing and transportation." The Department also reported that father resided in a three-bedroom trailer with his son in North Carolina, but the trailer burned down. Father's employment status was unknown at the time, although he received Social Security disability payments. The Department noted that a preliminary home study revealed concerns about Russell's capacity to care for E.C. and A.C.'s respective special needs. The preliminary home study also highlighted that Russell and her husband smoked cigarettes in the home, which could be an issue for A.C.'s asthma.

The CASA submitted updated reports on each child to the J&DR court. The CASA reported that E.C. required "consistent care in a safe and stable home," while A.C. was "out of control both at home and in school" and required "constant attention and no other children in the home to compete for attention with." The CASA expressed that "neither [mother], [father] or Ms. Russell (their grandmother) are equipped to provide these children with the care they need to thrive."

The Department also filed an update to the foster care service plan review. The Department expressed considerable concerns about mother's capacity to care for the minor children relating to their behaviors under mother's watch, including "verbal aggression, physical aggression, runaway, total regression in potty training, and intentional defecating and/or smearing of defecation." The Department further reported that father moved in with Russell following the burning down of his trailer, although he had since been incarcerated. Regarding Russell as a suitable caretaker, the Department reported that Russell's home required repairs, and

the only room available for E.C. and A.C. in Russell's home was currently occupied by Russell's step-grandson.[5]

On April 21, 2023, the J&DR court terminated mother's and father's parental rights to E.C. and A.C. and granted to the Department custody of E.C. and A.C. The J&DR court approved the Department's foster care plan with the goal of adoption based on (1) father's continued drug use and incarceration, (2) the minor children's unstable living arrangements, and (3) mother's continued "residence with a convicted registered sex offender." The court found as fact that termination of mother and father's parental rights was in the best interests of the children and that Russell was not a suitable placement given their special needs.

### III. Circuit Court Proceedings at Issue on Appeal

Mother and father each appealed the J&DR court's decisions to the Spotsylvania County Circuit Court. At trial, the Department called Ellie Reynolds, a senior family services worker in the foster care unit, to testify, and presented 13 exhibits, all of which were admitted. Mother did not present any witnesses, but presented a single exhibit which was admitted. Father called Russell to testify, and presented a single exhibit, which was admitted.

Reynolds's testimony principally focused on the history of mother and father's interactions with social services and the experiences of E.C. and A.C. throughout their time in foster care. Among other things, however, Reynolds testified that the home study for Russell revealed that Russell lived in a three-bedroom trailer which required repairs to the heating and air-conditioning systems. While the home was "neat and free from clutter," there were "holes in the walls," "roaches crawling [in] several rooms," and "[t]he home was smoky from the adults in the home smoking continuously." Russell did remedy the concerns about the heating and air

---

[5] Russell purportedly reported that she intended on moving her step-grandson into the living room of her home to open the room up for E.C. and A.C.

conditioning, but Reynolds testified that all of the rooms in the home were actively occupied, one of which by Russell's nine-year-old step-grandson. Further, Reynolds testified that Russell was unwilling to become a licensed foster parent, despite being informed that doing so was a requirement in Russell's home state of North Carolina.

Russell testified on direct that she had taken steps to prepare her home for the placement of E.C. and A.C., and described her relationship with the minor children. On cross, however, Russell acknowledged that four people lived in her trailer at the time of trial, not including father. Father was "going and coming" from Russell's trailer, "going to go see girls or being with a girlfriend"; father did not admit facts to Russell pertaining to his drug use, although Russell testified that she "c[ould] tell" when he was using drugs. To this latter point, Russell testified that if father wanted to use drugs, including cocaine, he would "get it down the road."

At the close of the evidence, the circuit court announced its ruling. The circuit court found, on clear and convincing evidence, that the Department "met their burden under 16.1-283(C)(2)" and that "it's in the best interest . . . to approve the adoption plan change and to terminate the parental rights." In coming to this determination the court relied on the fact that (1) father continued to abuse illegal drugs, (2) father was actively incarcerated, (3) neither mother nor father could offer stable living arrangements, (4) father remained on probation for assault charges, (5) father remained unemployed, (6) mother actively awaited trial on neglect charges, (7) mother and father had each only been partially compliant with the foster care plan, and (8) mother continued to reside with her paramour who was a registered sex offender.

Following the hearing, the circuit court entered orders terminating mother's and father's parental rights to E.C. and A.C., as well as permanency planning orders for E.C. and A.C.[6] The court terminated mother's parental rights pursuant to a finding under Code § 16.1-283(C) that

---

[6] Father did not appeal the circuit court's termination of his parental rights.

mother had been unwilling or unable within a reasonable period of time from the date E.C. and A.C. were placed in foster care to remedy substantially the conditions which led to the minor children's placement in foster care. The circuit court approved the foster care plan with the permanent goal of adoption based on, inter alia, the facts contained in the plan and a finding that mother's parental rights had been terminated in the best interests of the child.

Mother timely noted her appeal to this Court.[7]

ANALYSIS

Mother sets forth two assignments of error for appellate consideration. First, mother argues the evidence presented by the Department was insufficient to show that termination of her parental rights was in the best interests of E.C. and A.C., or that she had failed to remedy the conditions which led to the minor children's placement in foster care. Second, mother argues that the Department's evidence was insufficient for the circuit court to determine that relative placement with Russell was not a viable option.

"For purposes of appellate review, a [circuit] court's determination is considered to have settled all conflicts in the evidence in favor of the prevailing party, and the prevailing party's evidence is entitled to all reasonable inferences fairly deducible therefrom." *Farley v. Farley*, 9 Va. App. 326, 328 (1990). "On review of a [circuit] court's decision regarding the termination of parental rights, we presume the [circuit] court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to

---

[7] Both parties to this appeal waived oral argument.

support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

Each of mother's assignments of error are considered in turn.

## I. Termination Under Code § 16.1-283(C)(2)

Code § 16.1-283(C) provides that the parental rights of a parent whose child is placed in foster care may be terminated if the court makes two key findings based on clear and convincing evidence. First, the court must make a finding that terminating the parent's rights are in the best interests of the child. Code § 16.1-283(C). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming . . . responsibilities." *Lecky v. Reed*, 20 Va. App. 306, 312 (1995) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Circuit courts have "broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 328 (2013) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)).

Then, the court must find that either:

> 1. The parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship. . . . or
>
> 2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(1)-(2).  Termination of parental rights under Code § 16.1-283(C) inherently "contemplates the use, where possible, of alternatives less drastic than termination of parental rights."  *Helen W. v. Fairfax Cnty. Dep't of Hum. Dev.*, 12 Va. App. 877, 884 (1991) (quoting *Edwards v. Cnty. of Arlington*, 5 Va. App. 294, 312 (1987)).  "[A] court must determine what constitutes reasonable and appropriate efforts given the facts before the court."  *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338 (1992).  "The law does not require the division to force its services upon an unwilling or disinterested parent."  *Barkey v. Commonwealth*, 2 Va. App. 662, 670 (1986).  Further, this Court has explained that "[s]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes."  *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

Here, the circuit court had sufficient evidence before it to satisfy the requirements of Code § 16.1-283(C).  First, the court had evidence before it to conclude that termination was in the best interests of the minor children.  Among other things, the circuit court found that (1) E.C. and A.C. had been in foster care for almost a year and a half by the time the J&DR court held its hearing to terminate mother's parental rights; (2) mother was actively residing with her paramour, a convicted child sex offender, in a motel room; (3) mother has intellectual and mental disabilities of her own; and (4) mother could not afford her own expenses, let alone the added expenses that would necessarily come with welcoming E.C. and A.C. back into her home.  The fact that the minor children had remained in foster care for almost 17 months before the initial termination while mother made little progress toward reunification is enough, on its own, to support the court's "best interests" finding.  *See Lecky*, 20 Va. App. at 312 (holding that a circuit court erred by failing to terminate parental rights where, among other things, the child remained

- 10 -

in foster care for almost 2 years prior to the initial termination by a J&DR court). Yet the record reflects that the circuit court had more before it than the passage of time. Although mother reduces the Department's evidence to merely demonstrating that mother "would not be able to manage [E.C. and A.C.'s] treatment," the circuit court's determination involved a wider breadth of evidence than management of treatment, and this Court cannot say that the court's finding was unsupported by the evidence.

Second, the circuit court had evidence before it sufficient to find that mother had substantially failed to remedy the conditions that led to E.C. and A.C. being placed in foster care, as required under Code § 16.1-283(C)(2). Under the original foster care plan, mother was required to (1) maintain an active role with the Department and all treatment providers for the minor children; (2) maintain a consistent alcohol- and drug-free lifestyle; and (3) obtain and maintain suitable and stable housing free from negative influences, and financial stability. The record before us demonstrates that mother's steps toward addressing the plan's goals were, at best, perfunctory. Mother characterizes the Department's cessation of offered services to her as arbitrary. Yet the evidence suggests, at the very least, that the Department stopped offering services to mother "due to her inability to meaningfully engage in them." As for financial stability, mother had not even obtained financial stability, much less maintained it, by the time of the circuit court termination proceedings. Moreover, and perhaps most significantly, at the time of removal, the minor children were found living in a single bedroom, infested with pests, riddled with trash and animal feces, with liquor bottles easily accessible. Although mother had obtained housing by the time of the termination proceeding, this housing situation proved unstable and unsafe for the minor children. Mother resided in a motel room for which she owed

substantial unpaid rent.[8]  Further, mother continued to reside with a convicted child sex offender whose name was actively maintained on a sex offender registry.

Mother was offered services consistently from at least the time of the removal of the minor children in September 2021 until the time the foster care plan goal was changed in September 2022.  During that time, mother proved unable to secure safe and stable housing or steady, secure employment.  Mother apparently made choices that actually *worsened* the conditions, namely her cohabitation with a convicted child sex offender.  Mother attempted to engage the services offered to her but failed to recognize the extent of her own disabilities, let alone the significant special needs of her children.  Mother's mere attempt proved insufficient to satisfy the statutory standard—that is, to *substantially remedy* the conditions that led to E.C. and A.C. being placed in foster care, and in no more than 12 months.  *See* Code § 16.1-283(C)(2).  The evidence is sufficient to support the circuit court's finding that mother failed to substantially remedy the conditions which led to the foster care placement of E.C. and A.C., and therefore the circuit court did not err in this respect.

## II.  Relative Placement Under Code § 16.1-283(A)

Code § 16.1-283(A) provides, in pertinent part, that in any case where a court orders the termination of parental rights, the court:

> shall give a consideration to granting custody to a person with a legitimate interest, and if custody is not granted to a person with a legitimate interest, the judge shall communicate to the parties the basis for such decision either orally or in writing.

"This Court has interpreted this provision to require agency consideration of all "'reasonable options for placement with immediate relatives" as a prerequisite to a parental termination decision.'"  *Pilenza v. Nelson Cnty. Dep't of Soc. Servs.*, 71 Va. App. 650, 654 (2020) (quoting

---

[8] By the time of the hearing before the circuit court, however, mother had relocated with her paramour to an undisclosed location in North Carolina.

*Bagley v. City of Richmond Dep't of Soc. Servs.*, 59 Va. App. 522, 524 (2012)).  The Department of Social Services has an "affirmative duty to investigate all reasonable options for placement with immediate relatives" before seeking the termination of parental rights.  *Sauer v. Franklin Cnty. Dep't of Soc. Servs.*, 18 Va. App. 769, 771 (1994).  Code § 16.1-283(A), however, ultimately only requires that the Department present sufficient evidence upon which the court may properly determine "whether there are relatives willing and *suitable* to take custody of the child, and to consider such relatives *in comparison to other placement options*."  *Brown v. Spotsylvania Dep't of Soc. Servs.*, 43 Va. App. 205, 217-19 (2004) (emphases added) (holding that circuit court did not err in terminating parental rights without placing subject child with grandmother where grandmother had only met child once when the child was 10 months old).

Mother's second assignment of error misapprehends Code § 16.1-283(A).  The circuit court was not under any obligation to determine that refusing to place E.C. and A.C. with Russell was in their best interests, and the circuit court does not appear to have made any such finding explicitly.  To the contrary, the *Department* had the burden of producing sufficient evidence for the circuit court to determine the willingness and suitability of any such relatives for placement, and to consider those relatives among potential placement options.  *See Brown*, 43 Va. App. at 217-19.[9]

---

[9] The plain language of Code § 16.1-283(A) required that the circuit court communicate the basis for its decision against placing E.C. and A.C. with Russell, whether orally or in writing.  It appears that the circuit court gave no such explanation in its oral ruling, or in any of its written orders.  Nonetheless, to the extent there were any procedural defects in the circuit court's communication of its basis for changing the goal of the foster care plan to the parties, mother did not raise this issue below, nor does she make the argument on appeal.  Therefore, we do not address this issue.  *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ."); *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) ("[W]here a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

In any event, the court below had sufficient evidence before it to determine that Russell was not a suitable placement option for E.C. and A.C. and that placing the minor children in her custody would not have been in their best interests. Although Russell appears to have been *willing* to take custody of the minor children, she (1) lived in a three-bedroom trailer with three other individuals, (2) sought to bring two minor children with special needs into the home, (3) resided with individuals who regularly smoked cigarettes in the home, (4) was already the custodian of a nine-year-old child, (5) permitted father to come and go as he pleased, despite having an awareness of father's ongoing substance abuse issues, and (6) evinced a reticence to engage in the services extended to her by the North Carolina Department of Social Services. Further, family services worker Reynolds testified that Russell "did not want to become a licensed foster parent" and that "[s]he was not very understanding of what [the children's] needs even meant and [whether] there [were] any local providers down in the area to meet[] those needs." Based on these facts alone, the circuit court was within its discretion to determine that Russell was not a suitable placement for E.C. and A.C. Regarding A.C., she required significant one-on-one attention and regularly experienced behavioral issues in crowded environments like Russell's home. E.C., on the other hand, presents more significant special needs, which Russell did not appear to be equipped to handle in a crowded three-bedroom trailer with other minor children to look after.

Therefore, the circuit court did not err in placing E.C. and A.C. in the custody of the Department with the goal of adoption over placement with Russell.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed*.